ROCKY MOUNTAIN ANIMAL DE-
FENSE, Plaintiff–Appellant
and Cross–Appellee,

v.

COLORADO DIVISION OF WILDLIFE;
Russell George, in his official capacity
as Director of the Colorado Division of
Wildlife; Colorado Department of Natu-
ral Resources; Greg Walcher, acting in
his official capacity as Executive Di-
rector of Colorado Department of Natu-
ral Resources; Colorado Wildlife Com-
mission; Bernard L. Black, Jr., Mark
Levalley, Tom Burke, Olive Valdez, Phil
James, Rick Enstrom, Marianna Rafto-
poulos, and Robert Shoemaker, in their
official capacities as members of the
Wildlife Commission; Colorado Depart-
ment of Agriculture; Don Ament, in his
official capacity as Commissioner of the
Department of Agriculture; Ken Sala-
zar, in his official capacity as Attorney
General; and Bill Owens, in his official
capacity as Governor, Defendants–Ap-
pellees and Cross–Appellants.

No. 02CA0503.

Colorado Court of Appeals,
Div. I.

March 25, 2004.

Certiorari Denied Nov. 15, 2004.*

* Justice KOURLIS does not participate.

510

Haddon, Morgan, Mueller, Jordan, Mackey & Foremon, P.C., Ty Gee, Denver, Colorado; Jennifer L. Melton, Kim, Colorado, for Plaintiff–Appellant and Cross–Appellee.

Ken Salazar, Attorney General, Timothy J. Monahan, Assistant Attorney General, Denver, Colorado, for Defendants–Appellees and Cross–Appellants Colorado Division of Wildlife, Russell George, Colorado Department of Natural Resources, Greg Walcher, Colorado Wildlife Commission, Bernard L. Black, Jr., Mark Levalley, Tom Burke, Olive Valdez, Phil James, Rick Enstrom, Marianna Raftopoulos, Robert Shoemaker, Ken Salazar, and Bill Owens.

Ken Salazar, Attorney General, David Joeris, Assistant Attorney General, Denver, Colorado, for Defendants–Appellees and Cross–Appellants Colorado Department of Agriculture and Don Ament.

Opinion by Judge WEBB.

This action seeks a declaratory judgment, an injunction, and mandamus relief concerning article XVIII, § 12b (Amendment 14) of the Colorado Constitution, which prohibits trapping and poisoning of wildlife subject to limited exceptions.

Plaintiff, Rocky Mountain Animal Defense, appeals the judgment entered after a bench trial refusing injunctive or mandamus relief and declaring that the amendment does not prohibit poisoning of nontargeted wildlife incidental to prairie dog poisoning, which is lawful under an exception in the amendment that allows poisoning of rodents. Defendants, Colorado Division of Wildlife, Colorado Department of Natural Resources, Colorado Wildlife Commission, and Colorado Department of Agriculture (collectively, the agencies), along with various persons associated with them, cross-appeal the court's determination that Rocky Mountain has standing and its finding that the agencies have not taken sufficient steps to minimize so-called incidental poisoning. We affirm.

In 1996, the voters approved Amendment 14, which provides:

(1) It shall be unlawful to take wildlife with any leghold trap, any instant kill body-gripping design trap, or by poison or snare in the state of Colorado.

(2) The provisions of subsection (1) of this section shall not prohibit:

(a) The taking of wildlife by use of the devices or methods described in subsection (1) of this section by federal, state, county or municipal departments of health for the purpose of protecting human health or safety;

(b) The use of the devices or methods described in subsection (1) of this section for controlling:

(I) wild or domestic rodents, except for beaver or muskrat, as otherwise authorized by law; or

(II) wild or domestic birds as otherwise authorized by law;

(c) The use of non-lethal snares, traps specifically designed not to kill, or nets to take wildlife for scientific research projects, for falconry, for relocation, or for medical treatment pursuant to regulations established by the Colorado wildlife commission; or

(d) The use of traps, poisons or nets by the Colorado division of wildlife to take or manage fish or other non-mammalian aquatic wildlife.

(3) Notwithstanding the provisions of this section 12, the owner or lessee of private property primarily used for commercial livestock or crop production, or the employees of such owner or lessee, shall not be prohibited from using the devices or methods described in subsection (1) of this section on such private property so long as:

(a) such use does not exceed one thirty day period per year; and

(b) the owner or lessee can present on-site evidence to the division of wildlife that ongoing damage to livestock or crops has not been alleviated by the use of non-lethal or lethal control methods which are not prohibited.

The General Assembly enacted enabling legislation, which made unlawful the taking of wildlife by poison and other methods, subject to exceptions paralleling those in the amendment. Section 33–6–201, et seq., C.R.S.2003 (enabling statute).

Rocky Mountain alleges that, because the amendment prohibits all poisoning of wildlife other than wildlife targeted under the exceptions, the agencies are violating Amendment 14 by poisoning nontargeted wildlife and not taking action to prevent others from poisoning nontargeted wildlife in connection with poisoning prairie dogs. The legality of poisoning prairie dogs is not disputed.

The trial court found that "protected wildlife frequent some prairie dog burrows and are present when prairie dogs are poisoned." It explained, "The testimony established that some 208 species use prairie dog colonies to varying degrees and that approximately 20 use their burrows," including "rabbits, salamanders, snakes, and other reptiles and herbtiles." The court concluded that the presence of nontargeted species gives rise to "a significant risk of unnecessary and illegal killing of protected species when proper precautionary steps are not taken."

Based on these findings, the court framed the declaratory judgment issue as reconciling the conflict among the amendment's broad prohibition against poisoning wildlife, its express authorization to poison rodents (which include prairie dogs), and the probability that nontargeted wildlife located in and around prairie dog burrows would incidentally be poisoned when prairie dogs are poisoned.

The court declared that Amendment 14 permits an "incidental taking (unintended and unexpected) of protected wildlife when prairie dogs are poisoned." The court accepted the agencies' position that such incidental taking required "the poisoner to minimize the risk to other species using a negligence/carelessness standard."

The court then found that the agencies have never issued a citation for the unlawful poisoning of other wildlife which occurred while poisoning prairie dogs, despite the high likelihood that such poisoning occurred; that the agencies have not implemented regulations requiring prepoisoning observation or postpoisoning investigation of prairie dog colonies, actions which the court found would minimize the risk to nontargeted wildlife; and that the agencies have "failed to minimize the taking of protected species."

As "summary statements of declaratory judgment rulings and determinations of the parties' rights and responsibilities," the court stated that the agencies' enforcement officers "are not adequately trained on prairie dog colony biology"; to minimize incidental taking, applicators and poisoners should spend "far more time observing, recording and investigating the burrows, and making follow-up assessments"; "a detailed protocol should be implemented by the agencies"; the agencies' enforcement officers should thoroughly explain to poisoners "relocation and other alternatives [that] minimize the risk to protected species"; the officers should monitor "poisoners' observations and investigations" of prairie dogs burrows; the officers should communicate to all applicators and poisoners "that it violates the Colorado constitution's incidental taking rule to poison a prairie dog burrow" if evidence shows other species to be present; and use of zinc phosphate oatgrains, which "is less likely to harm protected species," should be "positively discussed" with applicators and poisoners.

However, the court declined to grant injunctive or mandamus relief. It explained that "fashioning a precise and proper re-

sponse to my declaratory judgment orders ... is best left to the Defendants."

## I. Standing

We first address standing because it is a threshold question of law. *Hall v. Walter,* 969 P.2d 224 (Colo.1998). On cross-appeal, the agencies argue the trial court erred in concluding that Rocky Mountain has standing. Although Rocky Mountain contends this argument was not timely raised, standing may be raised at any time. *Peters v. Smuggler–Durant Mining Corp.,* 910 P.2d 34 (Colo.App.1995), *aff'd,* 930 P.2d 575 (Colo. 1997). We agree with the trial court that Rocky Mountain has standing.

Because standing is necessary to invoke a court's jurisdiction, an appellate court reviews the trial court's determination de novo. *Friends of Black Forest Reg'l Park, Inc. v. Bd. of County Comm'rs,* 80 P.3d 871 (Colo.App.2003). In determining whether standing has been established, all averments of material fact in a complaint must be accepted as true. *Opie v. Denver Classroom Teachers Ass'n,* 701 P.2d 872 (Colo.App. 1985).

A plaintiff has standing if he or she has an "injury in fact" and the injury is to a "legally protected interest." *Wimberly v. Ettenberg,* 194 Colo. 163, 168, 570 P.2d 535, 539 (1977). The injury in fact test does not require that the plaintiff demonstrate an economic injury. "[H]arm to intangible values is sufficient." *Friends of Black Forest Reg'l Park, supra,* 80 P.3d at 877.

To be a "legally protected interest" for purposes of standing, the interest the complainant seeks to protect must be arguably within the zone of interests to be protected. *Friends of Black Forest Reg'l Park, supra.* Aesthetic and ecological interests are generally sufficient. *City of Greenwood Village v. Petitioners for Proposed City of Centennial,* 3 P.3d 427 (Colo.2000); *Friends of Black Forest Reg'l Park, supra.*

Rocky Mountain's complaint alleges that it is a nonprofit corporation authorized to transact business in Colorado, organized to enforce laws protecting wildlife, to prevent human-imposed suffering of animals, to appreciate wildlife throughout the Rocky Mountain region, including Colorado, and to pursue policies and laws that preserve and promote wildlife habitats.

According to the complaint, Rocky Mountain's members include hikers and wildlife enthusiasts who enjoy and appreciate wildlife in Colorado. They observe and study wildlife in natural habitats for recreational, educational, and aesthetic purposes, and are interested in preserving wildlife species from extinction and from unlawful diminution in numbers through unlawful and indiscriminate poisoning and killing. They participate in the monitoring, trapping, and relocation of prairie dogs. Members sustained injuries to their interests in the value of their property and in maintaining a safe environment as a result of poisons used against prairie dogs within their communities.

Amendment 14 protects Colorado wildlife from inhumane and indiscriminate methods of killing, as discussed in the following section. Environmental organizations have a legitimate role in ensuring the proper interpretation and implementation of such laws. *Friends of Black Forest Reg'l Park, supra.* Thus, Rocky Mountain alleged an ongoing controversy, and its members may have suffered injuries to their legally protected rights.

Accordingly, we conclude Rocky Mountain has standing to bring and maintain this case.

## II. Interpretation

We next address interpretation of the amendment, and conclude that its ambiguous language should be construed as not prohibiting the poisoning of nontargeted wildlife which is incidental to poisoning of prairie dogs by a person who intends to control rodents.

### A.

Interpretation of a constitutional provision is a question of law that we review de novo. *Petron Dev. Co. v. Washington County Bd. of Equalization,* 91 P.3d 408, 2003 WL 22305635 (Colo.App. No. 02CA1476, Oct. 9, 2003). "When construing a constitu-

tional amendment courts must ascertain and give effect to the intent of the electorate adopting the amendment." *Zaner v. City of Brighton,* 917 P.2d 280, 283 (Colo.1996).

> If the intent of the electorate is not clear from the language of the amendment, courts should construe the amendment in light of the objective sought to be achieved and the mischief to be avoided by the amendment. Courts should consider the amendment as a whole and, when possible, adopt an interpretation of the language which harmonizes different constitutional provisions rather than an interpretation which would create a conflict between such provisions.

*Zaner v. City of Brighton, supra,* 917 P.2d at 283 (citations omitted).

Courts should ascertain voter intent by giving words their ordinary and popular meaning, without engaging in narrow or overly technical construction of the language. *Davidson v. Sandstrom,* 83 P.3d 648 (Colo. 2004). A court may discern that intent by considering materials such as the ballot title, the submission clause, and the biennial "Bluebook" analysis of ballot proposals prepared by the legislature. *In re House Bill 99–1325,* 979 P.2d 549 (Colo.1999).

Courts must favor a construction of a constitutional amendment that will render every word operative, rather than one which may make some words idle or nugatory. *In re Great Outdoors Colo. Trust Fund,* 913 P.2d 533, 542 (Colo.1996). Courts should avoid an unreasonable interpretation or one that produces an absurd result. *Cook v. City & County of Denver,* 68 P.3d 586 (Colo.App. 2003).

Courts are also guided by general principles of statutory interpretation and aids in construction. *See* § 2–4–201, C.R.S.2003 (in enacting a statute, it is presumed that the entire statute is intended to be effective and a result feasible of execution is intended); *see also* § 2–4–203, C.R.S.2003.

### B.

Rocky Mountain argues Amendment 14 is unambiguous and its plain text prohibits *all* poisoning of nontargeted wildlife, whether incidental or intended, without regard to steps that may reasonably minimize incidental taking. The agencies assert that, to reconcile the broad prohibition against poisoning and the exceptions that permit poisoning to control rodents, among other circumstances, "Amendment 14's exception allowing the continued use of [prohibited] methods for rodent control must necessarily allow the unintentional taking of nontargeted wildlife related to their use." We agree with this portion of the agencies' position.

Initially, we note that although both the parties and the trial court discuss the taking of "protected species," the amendment contains no such term. Rather, it prohibits specified methods of taking wildlife, including poisons that are used to control prairie dogs. According to the ballot title, the amendment concerns "prohibited methods of taking wildlife."

The exception where the poisoner intends to control rodents and birds targets species, without limitation by any other circumstance. The other exceptions permit use of the prohibited methods on any species, but only under particular circumstances. Hence, the amendment's objective is prohibiting certain methods of taking wildlife, not protecting particular species.

The record supports the trial court's findings that poisons used to control prairie dogs kill indiscriminately; that other wildlife commonly lives in and around prairie dog burrows; and that, when prairie dogs are poisoned, as permitted by § 12b(2)(b)(I), a significant risk of poisoning nontargeted wildlife arises, contrary to the broad prohibition against poisoning (and other methods) set forth in § 12b(1).

Hence, we conclude §§ 12b(1) and 12b(2)(b)(I) create ambiguity: the amendment could be read as either precluding all poisoning of nontargeted wildlife, or as permitting some poisoning of nontargeted wildlife where the poisoner intends to control rodents. *See Zaner v. City of Brighton, supra,* 917 P.2d at 283 ("Language contained in a constitutional amendment is ambiguous if reasonably susceptible to more than one interpretation."); *In re Title, Ballot Title &*

*Submission Clause,* 961 P.2d 1077 (Colo.1998)(affording similar analysis of ambiguous and conflicting provisions).

Applying principles of statutory construction, we further conclude the voters did not intend to prohibit poisoning of nontargeted wildlife incidental to poisoning permitted by the amendment to control rodents.

The Bluebook "arguments for" Amendment 14 described poisons, traps, and snares as "inhumane" methods that "may not actually kill the animal immediately, causing the animal to suffer." This section further explains that the prohibited methods are indiscriminate:

> 2) Traps, snares and *poisons can be indiscriminate methods of killing wildlife.* Endangered or *non-target species may be mistakenly caught in traps* ....
>
> 3) Trapping, snaring and *poisoning may* not control individual problem-causing animals and *sometimes kill animals that have not caused problems* ....

(Emphasis added.)

Notwithstanding these concerns, the Bluebook described, and the voters approved, the continued use of these inhumane and indiscriminate methods to control rodents and birds, as well as against other species to protect human health or safety, to prevent ongoing damage to livestock or crops, and to manage fish and other non-mammalian aquatic wildlife by the Division of Wildlife. *See* Colo. Const. art. XVIII, § 12b(2)-(3).

Thus, because the voters were informed that poisoning of nontargeted wildlife would sometimes occur although the poisoner intended to control rodents, their approval of the exceptions leads us to interpret the amendment as not prohibiting the poisoning of nontargeted wildlife that is purely incidental to poisoning prairie dogs for purposes of rodent control. This conclusion is consistent with the principle that the voters are presumed to intend that the entire amendment be effective and feasible of execution. *See* § 2–4–201; *In re Great Outdoors Colo. Trust Fund, supra.*

Rocky Mountain neither provides a different interpretation to reconcile these provisions nor separately addresses the agencies' position that incidental taking should be subject to a reasonable minimization standard. Instead, Rocky Mountain argues that Amendment 14 prohibits even incidental poisoning because the rodent control exception does not specifically allow it.

Based on this reading, Rocky Mountain asserts "no rule of construction can change or distort clear constitutional language," quoting *Colorado State Civil Service Employees Ass'n v. Love,* 167 Colo. 436, 452, 448 P.2d 624, 630 (1968). Rocky Mountain also relies on the maxim, expressio unius est exclusio alterius, which means the expression of one thing is the exclusion of another. *See Reale v. Bd. of Real Estate Appraisers,* 880 P.2d 1205 (Colo.1994). Rocky Mountain urges analysis based on consideration of the objective sought to be achieved and the mischief to be avoided by the amendment. *See Davidson v. Sandstrom, supra.* And by comparison to § 33–6–109(1), C.R.S.2003, and other statutes dealing with unlawful taking of wildlife, Rocky Mountain argues that the amendment imposes strict liability on violators.

We discern no support for Rocky Mountain's interpretation. As to the clear language assertion, *Colorado State Civil Service Employees, supra,* involved an amendment that created two discrete categories of employees: those who were under civil service and six specifically identified positions, filled by gubernatorial appointment, who were not. One category could not affect the other category. Here, we have explained how the amendment's prohibition and its exceptions permit contradictory interpretations, because one necessarily affects the other.

As to the expressio unius assertion, the express mention of poisoning to control rodents cannot be read as the implied exclusion of incidentally poisoning nontargeted species. We note that the exception at issue is not limited to poisoning or trapping rodents, but more broadly addresses "use of ... [prohibited] methods ... for controlling ... rodents." Additionally, the voters were informed that poisoning kills indiscriminately, yet this and each of the other exceptions allows poisoning. Thus, we reject Rocky Mountain's character-

ization of incidental taking as a separate and unstated exception that is impliedly excluded.

As previously indicated, the amendment does not protect particular species. Applying the language of the Bluebook to the *Davidson v. Sandstrom* formulation, the amendment's objective is banning "methods of taking wildlife [that] are inhumane," and mischief arises because "poisoning may . . . sometimes kill animals that have not caused problems." This formulation does not change the fact that, as also summarized in the Bluebook, the amendment "prohibits the use of . . . poisons to take wildlife" *and* "permits the use . . . of poison by . . . individuals to control . . . rodents."

Rocky Mountain's citation to cases interpreting various federal statutes that protect particular species is unpersuasive. *See, e.g., United States v. Moon Lake Elec. Ass'n*, 45 F.Supp.2d 1070 (D.Colo.1999). Unlike the statutes at issue in those cases, the amendment focuses on unlawful methods of taking wildlife, rather than on protecting particular species. More importantly, its exceptions permit limited use of otherwise prohibited methods of killing that have an indiscriminate effect. The federal statutes do not contain any similar exceptions.

Therefore, we reject Rocky Mountain's position as a narrow and technical interpretation that would lead to an unreasonable and absurd result by eroding the rodent control exception. Given the likelihood that taking nontargeted wildlife will result from poisoning prairie dogs, as found by the trial court, under Rocky Mountain's strict liability interpretation of the prohibition against poisoning, a person could not poison prairie dogs, as permitted in the rodent control exception, without risking prosecution for killing nontargeted wildlife. Thus, poisoning of prairie dogs by a person who intends to control rodents would be chilled, if not prohibited entirely.

Rocky Mountain challenges this rationale on the basis that much less incidental taking of nontargeted wildlife would occur when poisoning rodents other than prairie dogs, because of the unique relationship between prairie dogs and other species. However, the record does not illuminate the extent of incidental taking arising from poisoning other rodent species.

Nevertheless, we leave for future resolution the agencies' proposed reasonable minimization limitation on the incidental taking of nontargeted wildlife. The enabling statute does not include this standard, but refers to use of prohibited methods "when there is no practical alternative." The parties have not addressed other standards, such as recklessness, which might also be consistent with the "no practical alternative" phrase. The agencies have not adopted interpretive regulations. *See, e.g., In re Great Outdoors Colo. Trust Fund, supra; Dodge v. Dep't of Soc. Servs.*, 657 P.2d 969 (Colo.App.1982)(General Assembly may permit an agency to promulgate rules and regulations).

Accordingly, we conclude that the amendment does not prohibit the poisoning of nontargeted wildlife which is incidental to poisoning prairie dogs, where the poisoner intends to control rodents.

### III. Injunctive and Mandamus Relief

Rocky Mountain next contends the trial court erred in declining to provide mandamus relief or enjoin the agencies to undertake action to prevent or minimize the incidental taking of nontargeted wildlife, including issuance of citations for poisoning of nontargeted wildlife that results from prairie dog eradication. We discern no abuse of discretion.

Rocky Mountain's complaint sought both a preliminary and a permanent injunction. A motion for a preliminary injunction was never filed.

Rocky Mountain requested that the agencies be restrained from "permitting, recommending or otherwise encouraging the application of poisons in and around prairie dog colonies and burrows in a manner that risks poisoning prairie dog-associated species" and from "applying poisons in and around prairie dog colonies and burrows in a manner that risks poisoning prairie dog-associated species." It also requested that the court mandate the agencies to "enforce and execute Amendment 14 and its enabling legislation"; "direct all persons and entities to

immediately cease applying poisons in and around prairie dog colonies and burrows in a manner that risks poisoning prairie dog-associated species"; "immediately notify all government subdivisions in writing that the application of poisons in and around prairie dog colonies and burrows in a manner that risks poisoning prairie dog-associated species is prohibited by law"; "respond promptly to reports of the planned, imminent or prior applications of poisons in and around prairie dog colonies and burrows ... and ... take appropriate action, including the investigation and prosecution of persons involved in such applications"; "document and memorialize all reports of poisonings in and around prairie dog burrows"; and "notify all persons and other legal entities licensed to administer poisons that they are legally prohibited from applying poisons in and around prairie dog colonies and burrows when it cannot be determined, or has not been determined, the burrows' occupants."

The complaint further sought "relief in the nature of mandamus and prohibition by forbidding the defendants from violating their duties to enforce Amendment 14 and its enabling legislation mandating that they comply with these duties by doing and refraining from doing those actions described in [the prayer for injunctive relief]."

The trial court explained at length its reasons for declining to award injunctive relief. It rejected in one sentence Rocky Mountain's request for mandamus relief as "untimely, inappropriate, and unwarranted." On appeal, the agencies do not dispute Rocky Mountain's contention that it timely requested mandamus relief. Both parties present argument primarily dealing with mandamus relief. Hence, we first address the propriety of mandamus relief under C.R.C.P. 106(a)(2).

### A.

■ Mandamus relief represents an extraordinary remedy awarded not as a matter of legal right, but in the exercise of sound judicial discretion. *Sherman v. City of Colorado Springs Planning Comm'n*, 763 P.2d 292 (Colo.1988). This relief will be granted "to compel performance by public officials of a plain legal duty imposed upon them by virtue of the office that they hold" when (1) the plaintiff has a clear right to the relief sought; (2) the defendant government agency or official has a clear duty to perform the act requested; and (3) no other adequate remedy is available to the plaintiff. *Widder v. Durango Sch. Dist. No. 9–R*, 85 P.3d 518, 523 n. 8 (Colo.2004); *Lazuk v. Sch. Dist. No. 1*, 22 P.3d 548 (Colo.App.2000).

■ Mandamus relief may be an appropriate remedy "where there has been a failure to perform a statutory duty." *Lamm v. Barber*, 192 Colo. 511, 517, 565 P.2d 538, 542 (1977). However, "mandamus will not lie to enforce duties generally, or to control and regulate a general course of official conduct for a long series of continuous acts to be performed under varying conditions." *Ahern v. Baker*, 148 Colo. 408, 414, 366 P.2d 366, 369 (1961)(quoting 34 Am.Jur. 935, § 157).

■ While mandamus relief will lie to compel an administrative body to exercise its discretion, *Van De Vegt v. Bd. of Comm'rs*, 98 Colo. 161, 55 P.2d 703 (1936), a court may not through mandamus relief direct *how* the discretion of an executive agency is to be exercised. *Lamm v. Barber, supra; Peoples Natural Gas Div. v. Pub. Utils. Comm'n*, 626 P.2d 159 (Colo.1981). Thus, mandamus relief can only command that an agency act, thereby setting it in motion. *Wicks v. City & County of Denver*, 61 Colo. 266, 156 P. 1100 (1916).

■ Executive agencies and officers charged with a duty to enforce criminal laws, such as those included in the enabling statute, have broad discretion in the performance of those duties. *People v. Dist. Court*, 632 P.2d 1022 (Colo.1981). This discretion extends to the power to investigate and determine who shall be prosecuted and what crimes shall be charged. *People v. Dist. Court, supra.* To preserve the separation of powers, prosecutorial charging decisions "may not be controlled or limited by judicial intervention." *People v. Hughes*, 946 P.2d 509, 516 (Colo.App.1997), *overruled on other grounds by Valdez v. People*, 966 P.2d 587, 591 (Colo.1998).

We first reject Rocky Mountain's argument that the trial court erred in refusing to order the agencies to undertake specific regulatory action, such as promulgating protocols requiring prepoisoning monitoring and postpoisoning investigation of prairie dog colonies by poisoners, both of which the court found would minimize incidental taking of nontargeted wildlife.

These actions would involve allocation of the agencies' resources and use of their expertise. Unlike in *Puerto Rico v. Branstad*, 483 U.S. 219, 227–28, 107 S.Ct. 2802, 2808, 97 L.Ed.2d 187 (1987), cited by Rocky Mountain, the actions that Rocky Mountain seeks to compel by mandamus are far more than "a plain official duty, requiring no exercise of discretion." Hence, mandamus relief would improperly direct the manner in which administrative discretion is to be exercised. *Lamm v. Barber, supra.* And unlike the plaintiffs in *Miller v. Collier*, 878 P.2d 141 (Colo.App.1994), Rocky Mountain does not identify any rights under the enabling statute that its members cannot exercise because of the agencies' failure to undertake specific regulatory action to implement a standard of reasonable minimization.

Nevertheless, Rocky Mountain argues that mandamus relief should be granted because, when the trial court found that the agencies had failed to minimize the taking of protected species, by implication it found that the agencies had failed to perform their duties under the amendment. Thus, according to Rocky Mountain, the trial court erred in refusing to order the agencies to undertake any of the actions that the court found would minimize incidental taking of nontargeted wildlife. We are not persuaded.

Contrary to Rocky Mountain's assertion that the agencies have done nothing to minimize incidental taking, the trial court concluded that the agencies have "done *little* to ensure that only the incidental taking of protected species occurs" (emphasis added). For example, the court noted that some enforcement officers discussed relocation and other alternatives with prospective poisoners. Thus, because the record does not show that the agencies have wholly failed to apply reason or analysis to their obligations arising

from the amendment and the enabling statute, Rocky Mountain is not entitled to mandamus relief even assuming arguendo that the amendment could be interpreted as implying a standard of reasonable minimization.

We also reject Rocky Mountain's argument that the trial court erred in refusing to order the agencies to cite persons who poison prairie dogs for violation of the enabling statute's criminal prohibitions. The court did not find that any specific, prosecutable violation occurred but went uncited. Enforcement action under the enabling statute is no less discretionary than under any other criminal statute. Neither the amendment nor the enabling statute expressly requires the agencies to investigate and cite activities that merely risk the poisoning of nontargeted wildlife.

Additionally, the trial court did not find, and Rocky Mountain does not direct our attention to anything in the record showing, that since commencement of this action representatives of the agencies have poisoned nontargeted wildlife in connection with control of prairie dogs.

Accordingly, we discern no abuse of discretion in the trial court's refusal to provide mandamus relief.

## B.

To the extent Rocky Mountain separately argues that the trial court should have granted injunctive relief, we are not persuaded.

Entry or denial of injunctive relief is a discretionary decision of the trial court that will not be disturbed on appeal absent an abuse of discretion. *Langlois v. Bd. of County Comm'rs*, 78 P.3d 1154 (Colo. App.2003). The requirements for a permanent injunction are similar to those set forth in *Rathke v. MacFarlane*, 648 P.2d 648 (Colo. 1982), except that the applicant must show actual success on the merits rather than merely a reasonable probability of success, and preservation of the status quo pending trial would no longer be relevant. Thus, to obtain a permanent injunction, Rocky Mountain had to show (1) a danger of real, immediate, and irreparable injury exists that may be prevented by injunctive relief, (2) no plain,

speedy, and adequate remedy at law is available, (3) an injunction will not disserve the public interest, and (4) the public interest favors the injunction. *Langlois v. Bd. of County Comm'rs, supra.*

■ Rocky Mountain cites no Colorado authority recognizing broad judicial power to enjoin an executive agency, apart from the power to act under C.R.C.P. 106. Judicial power to enjoin an executive agency under the doctrine of inherent power is limited. *Kort v. Hufnagel,* 729 P.2d 370 (Colo.1986). For example, it should be exercised where an agency refuses to obey a court order. *Meredith v. Zavaras,* 954 P.2d 597 (Colo.1998).

The complaint asked for an injunction in broad terms:

... enjoining the defendants from violating Amendment 14 and its enabling legislation, enjoining the defendants from refusing and otherwise failing to use every means at their disposal to stop the poisoning of wildlife protected under state laws, mandating that the defendants enforce such state laws, and mandating that the defendants use every means at their disposal to stop the poisoning of wildlife protected under such state laws.

Rocky Mountain does not assert that the agencies stand in violation of any court order.

Rocky Mountain presents no bases for distinguishing the injunctive relief claim from its claim for mandamus relief. Given the prosecutorial and otherwise discretionary nature of the agencies' actions at issue in both claims, and our conclusion that the trial court properly denied mandamus relief, we likewise perceive no abuse of discretion in the denial of injunctive relief.

Accordingly, we discern no abuse of discretion in the court's denial of injunctive and mandamus relief.

## IV. Reopening the Case

Rocky Mountain contends the trial court abused its discretion in refusing to reopen the case to admit contested exhibits. We disagree.

■ A trial court may in its discretion permit a party who has rested to reopen a case for the purpose of presenting further evidence. *Williams v. Foster Frosty Foods, Inc.,* 497 P.2d 339 (Colo.App.1972)(not published pursuant to C.A.R. 35(f)). Evidentiary rulings constitute reversible error only when they affect a "substantial right" of the objecting party. CRE 103(a); *KN Energy, Inc. v. Great W. Sugar Co.,* 698 P.2d 769, 784 (Colo. 1985).

■ When the trial began, the court instructed counsel that exhibits would be admitted as trial proceeded, but noted "there may be some cleanup at the end" regarding exhibits. After the trial was over, the court held a hearing at which it admitted all stipulated exhibits offered by Rocky Mountain for the first time, but denied Rocky Mountain's motion for the admission of any contested exhibits.

Rocky Mountain does not explain how any of the contested exhibits would have been likely to change the result below had they been admitted. Moreover, the trial court not only would have had to reopen the case for admission of these exhibits, but would also have had to entertain argument and consider the relationship to other evidence in resolving admissibility of the contested exhibits.

Accordingly, we discern no abuse of discretion.

## V. Costs

Rocky Mountain contends the trial court erred in not granting its motion for costs under § 13–16–104, C.R.S.2003. We disagree.

Although generally costs may be awarded to the prevailing party in the court's discretion, costs against the State of Colorado, its officers, or agencies may be imposed "only to the extent permitted by law." C.R.C.P. 54(d). "Unless the General Assembly so directs, costs are not taxable against the state, its officers, or agencies." *McFarland v. Gunter,* 829 P.2d 510, 511 (Colo.App.1992). Because § 13–16–104 "contains only general provisions entitling a prevailing party to recover costs ... it is not an express authorization allowing the assessment of costs against the State." *McFarland v. Gunter, supra,* 829 P.2d at 511.

Here, Rocky Mountain sought costs as well as amendment of the judgment in its C.R.C.P. 59 motion. The trial court denied the motion in a brief order that did not separately address costs.

■ On appeal, Rocky Mountain presents only *Branch v. Colorado Department of Corrections*, 89 P.3d 496, 2003 WL 22965074 (Colo.App. No. 01CA2403, Dec. 18, 2003), as authority permitting costs to be awarded against the state. There, a cost award against the state was upheld because the plaintiff prevailed under C.R.C.P. 106. Here, we have affirmed the trial court's decision not to award mandamus relief.

Moreover, Rocky Mountain is not the "prevailing party" under C.R.C.P. 54(d) because it did not prevail on any other material issue in the case. Both its interpretation that Amendment 14 prohibits all poisoning of non-targeted wildlife and its request for injunctive relief were rejected by the trial court.

Nevertheless, Rocky Mountain argues that it prevailed because of statements in the portion of the order entitled "summary statements of declaratory judgment rulings and determinations of the parties' rights and responsibilities." The statements concern the agencies' failure adequately to train officers, explain relocation and other alternatives to poisoners and inform them of activity that constitutes a violation, monitor poisoners' observations, and prefer poisoned oatgrains over other prohibited methods of controlling prairie dogs, as well as the need for a detailed protocol on observing burrows and making follow-up assessments. We are not persuaded.

In light of our conclusions that these matters are within the agencies' discretion, and that the trial court did not err in denying injunctive and mandamus relief forcing the agencies to implement any of these summary statements, the statements alone do not make Rocky Mountain the prevailing party. *See Bainbridge, Inc. v. Douglas County Bd. of Comm'rs*, 55 P.3d 271 (Colo.App.2002)(to be a "prevailing party" for the purposes of rule awarding costs, a party must have succeeded on a significant issue presented by the litigation and must have achieved some of the benefits sought in that action).

Accordingly, we conclude the trial court did not abuse its discretion in declining to award Rocky Mountain its costs.

## VI.   Sufficiency of Evidence

■ The agencies' cross-appeal challenges sufficiency of the evidence to support the trial court's findings that they have not taken appropriate steps to minimize the incidental taking of protected species. We do not address this issue.

Rocky Mountain moved to strike the agencies' reply brief. It then sought reconsideration of the denial of that motion on the basis that the agencies' sufficiency argument was not properly the subject of a cross-appeal because the agencies did not seek to expand their rights under the judgment. In response, the agencies stated that they "are not seeking to set aside the ultimate determination of the trial court" to deny injunctive relief, but "are simply providing ... additional bases for upholding the denial of injunctive relief."

The motion to reconsider was deferred to the division considering the merits of the appeal. We conclude that, because the sufficiency argument does not seek to expand the agencies' rights under the judgment, it is not properly the subject of a cross-appeal. *See Fonden v. U.S. Home Corp.*, 85 P.3d 600 (Colo.App.2003). Moreover, the agencies argue sufficiency for the first time in their reply brief. *People v. Medina*, 72 P.3d 405 (Colo.App.2003)(issue raised for the first time in reply brief need not be considered).

The judgment is affirmed.

Judge MARQUEZ and Judge TAUBMAN concur.